

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
## NO. AP-75,968
---

**WESLEY LYNN RUIZ, Appellant**

**v.**

**THE STATE OF TEXAS**

---
### ON DIRECT APPEAL FROM CAUSE NO. F07-50318-M
### IN THE 194TH JUDICIAL DISTRICT COURT
### DALLAS COUNTY
---

 **PRICE, J., delivered the opinion of the Court in which KELLER, P.J. and MEYERS, WOMACK, KEASLER, HERVEY and COCHRAN, JJ., joined. JOHNSON, J., concurred in the result.**

**O P I N I O N**

 The appellant was convicted of intentionally or knowingly causing the death of a

Dallas police officer, a capital offense.[1]  The jury answered the statutory special issues in

---

[1] TEX. PEN. CODE § 19.03(a)(1) ("A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and . . . the person murders a peace officer . . . who is acting in the lawful discharge of an official duty and who the person knows is a peace officer[.]").

such a way that the trial court was obliged to assess the death penalty.[2] Appeal to this Court is, therefore, automatic.[3] The appellant raises fourteen points of error, including challenges to the sufficiency of the evidence to support both the guilty verdict and the first special issue at the punishment phase of trial. We will therefore summarize the evidence in the light most favorable to the jury's verdicts.[4]

## GUILT/INNOCENCE PHASE ISSUES

## Evidentiary Sufficiency Issues

On March 21, 2007, the homicide division of the Dallas Police Department issued a bulletin to its officers to be on the lookout for a 1996 four-door Chevy Caprice with dark tinted windows and chrome wheels, red and gray in color, that was suspected to have some involvement in a capital murder. Two days later, on March 23rd, two plainclothes officers in an unmarked police vehicle spotted a car matching this description on Stemmons Freeway.[5] They summoned marked patrol cars to stop the suspect vehicle and followed it as it exited the freeway at Mockingbird Lane and drove into West Dallas. Corporal Mark Nix arrived, positioning his patrol car directly behind the Caprice and activating his overhead

---

[2] TEX. CODE CRIM. PROC. art. 37.071(2)(b) & (2)(e).

[3] *Id.*, Section (2)(h).

[4] *Jackson v. Virginia*, 443 U.S. 307 (1979); *Burns v. State*, 761 S.W.2d 353, 355 (Tex. Crim. App. 1988).

[5] Although it matched the description of the car sought in the March 21st bulletin, this particular Chevy Caprice did not turn out to be the one sought in the capital-murder investigation.

lights and video camera. The Caprice momentarily braked as if to pull over, but then suddenly raced off at high speed down the winding road, followed by Nix and at least one other patrol car in hot pursuit. The ensuing events were recorded by Nix's video camera and that of the patrol car directly behind him, both of which recordings are in evidence.

Apparently taking a curve too fast, the Caprice hit the left-hand curb and spun out of control. It barreled backwards down a slight incline on the right side of the street and came to rest facing the roadway, its back-end apparently blocked by a fence. Nix followed the Caprice down the incline and pulled to a stop, directly hood to hood. The patrol car behind Nix also pulled off the road and came to a halt on the passenger side of the Caprice, a short way off but close enough to effectively hem it in. Corporal Nix jumped out of his patrol car and rushed to the front passenger side of the Caprice. There he began to swing his baton with his left hand, smashing it against the tinted front passenger window.[6] He paused momentarily to place his pistol on the ground so that he could use both hands to wield the baton and continued striking the window, punching a small hole through it. A second later, a single gun shot shattered the rear passenger window, the bullet striking Nix's badge and splintering. A fragment entered Nix's chest at the level of his clavicle, severing his left common carotid artery. The other officers responded with a hail of gunfire, then dragged Nix to cover and summoned the SWAT team. The appellant was eventually pulled from behind

---

[6] All of the windows were so darkly tinted that the officers could barely make out a "silhouette" behind the wheel of the Caprice.

the wheel of the Caprice, wounded and unconscious, the pistol with which Nix had been shot found in his lap. Nobody else was in the car. Nix was pronounced dead at the hospital, but the appellant was able to survive his multiple wounds.

In his fourth point of error, the appellant contends that the evidence was legally insufficient to establish that Nix was acting in the lawful discharge of an official duty when the appellant shot him. Pointing to a written Dallas Police Department (DPD) policy, the appellant argues that Nix acted outside the bounds of his official duty when he failed to use his public-address system to order the appellant out of the Caprice, but instead rushed the car and began to pound on the window with his baton. He claims that this violated departmental policy for felony traffic stops, which expressly and emphatically provides that officers ordinarily should not "rush" a suspect who has been stopped on the roadside. And indeed, DPD policy declares that "[t]his is true for most types of felony stops, *whether end of chase*, or any other high risk stop."[7] The appellant acknowledges that the case law from this Court plainly holds that, for purposes of Section 19.03(a)(1) of the Penal Code, an officer acts in the lawful discharge of his official duties so long as he is on duty and in uniform; the fact that he may be effectuating an unconstitutional arrest, or a lawful arrest in an improper or

---

[7] (Emphasis supplied.) This written policy was admitted into evidence as Defendant's Exhibit 1. Several DPD officers testified for the State that the official policy prohibition against "rushing" a suspect applies only to an initial felony traffic stop, and that, once the appellant initiated the high-speed chase in this case, that policy no longer applied.

unlawful manner, does not mean he is not acting in the lawful discharge of an official duty.[8]

Regardless of whether Nix violated departmental policy by "rushing" the Caprice and breaking the window in an attempt to ascertain and apprehend whoever was inside, such a breach of departmental policy would not render his conduct in discharging his duty as a peace officer any less "lawful," in contemplation of Section 19.03(a)(1),[9] than had he tried to effectuate the appellant's arrest in an unconstitutional manner. As long as Nix was acting within his capacity as a peace officer, as we have held, he was acting within the lawful

---

[8]

   *Montoya v. State*, 744 S.W.2d 15, 29-30 (Tex. Crim. App. 1987); *Guerra v. State*, 771 S.W.2d 453, 460-61 (Tex. Crim. App. 1988); *Hughes v. State*, 897 S.W.2d 285, 297-98 (Tex. Crim. App. 1994).

[9]

   Section 1.07(48) of the Penal Code defines "unlawful" to mean "criminal or tortious or both[.]" TEX. PEN. CODE § 1.07(48). We are aware of no precedent, and the appellant cites none, holding that a violation of a police department policy constitutes criminal or tortious conduct *per se*. Instead, he relies upon *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985), in which the Supreme Court held that law enforcement use of deadly force to accomplish a felony arrest violates the Fourth Amendment unless there is reason to believe the suspect "has committed a crime involving the infliction of serious physical harm, . . . and if, where feasible, some warning has been given." But there is no evidence that Nix used deadly force against the appellant when he rushed the Caprice and breached the passenger side window. (The jury was instructed on self-defense. But applicability of self-defense to the present facts turns on the reasonableness of the appellant's perception, should the jury find that he in fact harbored such a perception, that Nix was attempting unjustifiably to use deadly force—*not* on whether Nix actually *was* using deadly force. TEX. PEN. CODE § 9.32.) Nor can it be said, under the circumstances, that Nix's conduct "shocks the conscience" so as to amount to a violation of substantive due process under another case that the appellant relies upon, *City of Sacramento v. Lewis*, 523 U.S. 833 (1998). In an analogous context, we have held that a public servant acts within the lawful discharge of his official duties so long as his conduct, committed during the course of those duties, does not rise to the level of a criminal or tortious abuse of his office—regardless of whether it violates official agency policy. *See Hall v. State*, 158 S.W.3d 470 (Tex. Crim. App. 2005) (construing "lawful discharge of an official duty" for purposes of Texas's assault-on-a-public-servant statute).

discharge of his official duties.[10]  To intentionally or knowingly cause an officer's death under these circumstances still constitutes a capital offense.

In his second point of error, the appellant suggests that by adhering to the cases that have construed Section 19.03(a)(1) in this way, we risk rendering the statute too indistinct to withstand constitutional scrutiny.  The Eighth Amendment requires that any scheme for imposing the death penalty involve guided jury discretion at the so-called "eligibility" stage.[11] In Texas, at least part of the eligibility determination is built into Section 19.03 itself, which defines the subset of the broader class of all murders that constitutes a capital offense.[12]  To pass constitutional muster, the Supreme Court has said, the eligibility stage must operate to channel jury discretion by "genuinely narrow[ing] the class of persons eligible for the death penalty and . . . reasonably justify[ing] the imposition of a more severe sentence on the defendant compared to others found guilty of murder."[13]  The appellant argues that our past construction of Section 19.03(a)(1), by effectively removing the word "lawful" from the

---

[10]

*Guerra v. State*, *supra*, at 461.

[11]

*Tuilaepa v. California*, 512 U.S. 967, 971-75 (1994).  To satisfy the Eighth Amendment, any capital punishment scheme must include both an "eligibility" process, during which jury discretion must be narrowly circumscribed so as to avoid arbitrary and capricious application, and a "selection" process, during which the jury's discretion must remain relatively unfettered so as to ensure an assessment of punishment that is tailored to the individual.  *Id*.

[12]

*See Lowenfield v. Phelps*, 484 U.S. 231, 245 (1988) (under Texas statutory scheme, constitutionally required narrowing function occurs, not by the use of aggravating factors at the punishment phase, but in the definition of capital murder itself, litigated at the guilt phase).

[13]

*Zant v. Stephens*, 462 U.S. 862, 877 (1983).

statute, fails sufficiently to narrow the class of murderers eligible for capital punishment, resulting in the arbitrary and capricious imposition of the death penalty.

But the Supreme Court has also said that, "[b]ecause 'the proper degree of definition' of eligibility . . . factors often 'is not susceptible of mathematical precision,' our [Eighth Amendment] vagueness review is quite deferential."[14] So long as an eligibility factor "has some common-sense core of meaning . . . that criminal juries should be capable of understanding[,]" it will adequately serve its Eighth Amendment narrowing function.[15] As our case law has construed Section 19.03(a)(1), it certainly has a common-sense core of meaning: A police officer is acting within the lawful discharge of his official duties under the statute so long as he is "on duty, in uniform[.]"[16] A jury would have no trouble comprehending this core meaning. Moreover, as so construed, the statute clearly identifies a sub-class of murderers that the Legislature could rationally conclude is deserving of the most severe penalty available. As a matter of public policy, the Legislature may legitimately extend the presumed deterrent effect of capital punishment to discourage citizens from murdering police officers—even those officers who are not necessarily operating within the precise parameters of official departmental policy. Protection of police officers while they are on duty represents a reasonable justification for imposing a more severe penalty than

---

[14] *Tuilaepa v. California*, *supra*, at 973 (quoting *Walton v. Arizona*, 497 U.S. 639, 655 (1990)).

[15] *Id*. (internal quotation marks omitted).

[16] *Guerra v. State*, *supra*, at 461.

applies to other murderers. Even if the appellant were right to criticize our past construction of Section 19.03(a)(1)—which we by no means concede—our construction of the statute does not make it indefinite or its imposition arbitrary and capricious. That it narrows the class of murderers susceptible to execution to a sub-class that is broader than the appellant would prefer does not render it intolerably vague for Eighth Amendment purposes. For these reasons, we recently (and unanimously) rejected a similar argument that the aggravating element embodied in Section 19.03(a)(1), as we have construed it, is unconstitutionally vague.[17] We likewise reject it here and hold that the evidence was sufficient to support the appellant's conviction for capital murder. We overrule the appellant's second and fourth points of error accordingly.

In his third point of error, the appellant also argues that the evidence is factually insufficient to support the conviction, for the same reasons. This Court no longer entertains claims of factual insufficiency in capital-murder cases, however.[18] We overrule the appellant's third point of error.

### Specific Misconduct Evidence to Show First Aggressor

In his first point of error, the appellant argues that the trial court erred in sustaining the State's objection to the admission of testimony with respect to three prior acts of misconduct on Corporal Nix's part. The appellant proffered this testimony in order to show

---

[17]
*Mays v. State*, 318 S.W.3d 368, 388-89 (Tex. Crim. App. 2010).

[18]
*Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010).

Nix's state of mind at the time he rushed the Caprice; the purpose was to help the jury understand and appreciate why Nix acted (and therefore, inferentially, to establish *that* he acted) as the first aggressor under the circumstances. The appellant argued that this evidence was admissible in support of his claim that he was compelled to use deadly force in self-defense, which theory was indeed presented to the jury in the court's charge. The State maintained that the testimony was inadmissible under Rule 404(b) of the Texas Rules of Evidence,[19] arguing that it had no relevance apart from inferences of character conformity, and adding, incidentally and without elaboration, that it was "also prejudicial to the State." The trial court sustained the State's objection, expressly invoking Rule 404(b), but allowed the appellant to develop the record in the jury's absence. In response, the appellant presented testimony from three witnesses who related past incidents in which Nix, in his capacity as a police officer, allegedly treated suspects who either fled apprehension or did not immediately respond to his assertion of official authority with arguably greater force than was necessary under the circumstances.

The first witness, Raquel Sosa, testified that, in June of 2002, Nix shot and killed her boyfriend when they tried to outrun the police after an attempted traffic stop.[20] Karlous Lake,

---

[19] Tᴇx R. Eᴠɪᴅ. 404(b).

[20] Sosa denied that her boyfriend was carrying a weapon that night or that he shot at Nix first. The State proffered evidence that Sosa's boyfriend gave a dying declaration in which he admitted having discarded a nine-millimeter pistol after he was shot. The police subsequently found the pistol where Sosa's boyfriend said he had discarded it, and a nine millimeter cartridge was discovered at the site of the shooting. The State also proffered that, "after investigation, this use of deadly force

the second witness, was a marine who testified that, as he was leaving a bar with friends in the early morning hours in March of 2005, a group of police officers told them to "hurry up, get home before your curfew." When Lake asked them what time the curfew was and began to walk away, Nix shot him with a taser, though Lake did not believe he had done anything threatening or provocative. Another officer told Lake that the reason he had been tasered was that he had refused to stop, but Lake maintained that none of the officers ordered him to stop. Lake was arrested for public intoxication though he claimed to have had only one drink; the case was later dismissed.[21] Finally, Anthony Williams testified that, in August of 2006, when he was fourteen years old, he was running down the street when Nix ordered him to stop and get down on the ground. When Williams immediately complied, Nix handcuffed him behind his back, lifted him up by the handcuffs, and "threw" him into a squad car, threatening to "knock all [his] teeth out." Williams was soon released and never charged with any offense. Other officers at the scene filed a complaint against Nix for using excessive force to lift Williams up, but made no mention of Nix's having thrown Williams into the squad car.

The appellant argued that the specific misconduct evidence was admissible because it explained that Nix's conduct in rushing the Caprice and battering the passenger side

was ruled as . . . justifiable" on Nix's part.

[21] The State proffered testimony from another officer that Lake had incited the incident with the police officers and, when they tried to arrest him for public intoxication, he resisted arrest. When Lake "approached" Nix with an apparently threatening gesture, Nix fired his taser.

window was typical of the sort of violent responses he demonstrated over the course of his career when confronted with suspects who did not immediately accede to his authority. He argues that the testimony of his proffered witnesses was admissible under of Rule 404(b) of the Texas Rules of Evidence,[22] as we have construed that rule in *Tate v. State*.[23] We need not address this contention, however, because we hold that any purported error was harmless under Rule 44.2(b) of the Texas Rules of Appellate Procedure.[24]

Because the error, if any, was not of constitutional dimension, we measure harm against the standard in Rule 44.2(b), which requires us to "disregard" any "error . . . that does not affect" the appellant's "substantial rights[.]" That Nix was the first aggressor in this case, in the sense that his conduct in rushing to the Caprice and breaking out the window with his baton constitutes an act of aggression that came before the appellant's use of deadly force, is uncontradicted on the present record. In fact, it was established beyond cavil by the videos that were taken from the squad cars. There was no need on the part of the defense to shore up that evidence with specific misconduct evidence explaining that Nix had a history of overreacting to resistence to his police authority. It is most unlikely on the facts of this case that the jury's resolution of the appellant's self-defense claim would have turned on the question whether Nix's aggressive behavior came first. Whether the appellant legitimately

---

[22] TEX. R. EVID. 404(b).

[23] 981 S.W.2d 189 (Tex. Crim. App. 1998).

[24] *Id.*

resorted to deadly force to protect himself from Nix's aggression depended on the nature of that aggression and the appellant's reasonable perception of it under the circumstances—not on its timing. The jury was called upon to decide, not when Nix's aggression occurred with respect to the appellant's own conduct, which was definitively established by the video evidence, but whether Nix's aggression was of such a degree and character that the appellant, from his standpoint, was reasonable in concluding (if, in fact, he did conclude) that he must immediately resort to deadly force to protect himself. Because there is no showing that appellant had any knowledge of Nix's history, proof of Nix's past misconduct while on duty was not relevant to this pivotal jury issue. We therefore conclude that any error in failing to admit the appellant's proffered testimony did not affect his substantial rights. Accordingly, we overrule his first point of error.

## PUNISHMENT PHASE ISSUES

### Evidentiary Sufficiency Issues

In his sixth point of error, the appellant challenges the legal sufficiency of the evidence to establish, beyond a reasonable doubt, that there is a probability he would commit criminal acts of violence that would constitute a continuing threat to society.[25] We review the evidence in the light most favorable to the jury's disposition.[26] As aptly summarized by the State in its brief, "the evidence [relevant to this special issue] showed appellant was a

---

[25] TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1).

[26] *Hunter v. State*, *supra*, at 673.

veteran criminal and gang member fully immersed in a life of drugs, guns, and violence."[27]

And indeed, the appellant expressly "concedes that some of the *Keeton* factors seem to cut against an argument of insufficiency of the evidence to support an affirmative finding to the future dangerousness special issue."[28] He argues, however, that there is insufficient evidence to support a jury finding, beyond a reasonable doubt, that he will probably continue to commit acts of violence in the setting in which he would find himself for the rest of his life under current law, namely prison. But, as we recently re-emphasized in *Estrada v. State*,[29] our appellate review of the sufficiency of the evidence to establish future dangerousness is not limited to the defendant's probable conduct within prison walls, even with the advent of life-without-parole as the exclusive alternative to the death penalty for capital offenders.[30] We hold that the evidence was legally sufficient to support the jury's determination that the appellant would commit criminal acts of violence that would constitute a continuing threat to society and overrule the appellant's sixth point of error.

---

[27] State's brief, at 46.

[28] Appellant's brief, at 52 (citing *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987)). The *Keeton* factors include the circumstances of the offense, the calculated or deliberate nature of the defendant's acts, the degree and severity of the defendant's prior criminal record, his age and personal circumstances, whether duress was involved, and any psychiatric or character evidence.

[29] 313 S.W.3d 274 (Tex. Crim. App. 2010)

[30] *Id*. at 280-85 (even following the passage of life-without-parole in 2005, appellate review of legal sufficiency of the evidence to establish future dangerousness looks to defendant's likely conduct in the abstract, "whether [the defendant will be] in or out of prison").

In his seventh point of error, the appellant also argues that the evidence is factually insufficient to support the jury's finding of future dangerousness. We have never indulged claims of factual insufficiency with respect to future dangerousness.[31] Moreover, this Court no longer entertains claims of factual insufficiency in capital-murder cases on issues for which the State bears the burden of proof.[32] The appellant argues at some length that this Court's refusal to assay factual sufficiency of the evidence to support a jury finding of future dangerousness invidiously discriminates against capital-murder defendants, contrary to the Eighth and Fourteenth Amendments to the United States Constitution. Whatever validity this argument may once have held,[33] there is none now, in light of our recent rejection of factual sufficiency review across the board.[34] Accordingly, we overrule the appellant's seventh point of error.

## Prosecutor's Comment Regarding Parole Eligibility

In his fifth point of error, the appellant claims that the prosecutor reversibly erred to suggest to the jury, during his examination of a State's witness, that the law might change at some future date to provide that a capital defendant, sentenced to life without parole,

---

[31] *Hunter v. State*, 243 S.W.3d 664, 672 (Tex. Crim. App. 2007).

[32] *Martinez v. State*, *supra*.

[33] *But see McGinn v. State*, 961 S.W.2d 161, 169 (Tex. Crim. App. 1998).

[34] *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010).

would nevertheless be eligible for parole. He contends that, broaching this suggestion in the jury's presence, over the appellant's objection, and then reiterating it shortly thereafter over the appellant's renewed objection, violated his right to due process of law. He relies primarily upon the United States Supreme Court's plurality opinion in *Simmons v. South Carolina*.[35] In our view, however, the objection that the appellant leveled at trial was insufficiently specific to preserve his present claim for appeal.

In an effort to counter what it anticipated to be the appellant's defensive posture at the punishment phase of the case, namely that the appellant would not pose a significant danger to society if assessed a sentence of life without parole, the State presented testimony from A. P. Merrilott. Merrilott is a long-time investigator with a special prosecution unit, based in Walker County, that prosecutes violent crimes committed within the state prison system. He testified with regard to the classification of incoming inmates, and specifically, non-death-sentenced capital offenders, within the prison system, describing the opportunities that such inmates have to commit violent acts while in prison. Toward the end of Merillott's direct-examination testimony, the relevant colloquy occurred:

> Q. [By Prosecutor] Recently Mr. Merrilott, the law has changed here in Texas to where if one is convicted of capital murder by a jury and sentenced to life, that defendant no longer has the option of parole; is that correct?

> A. That's correct.

> Q. So Mr. Ruiz is sentenced to life in this case based on the answers

---

[35] 512 U.S. 154 (1994) (plurality opinion).

to the two special issues, he has no possibility or potential for parole?

A.  That's correct.

Q.  Unless the laws change sometime in the future?

A.  Right.

[Defense Counsel]:  Your Honor, we would object to that as being improper.  There is no evidence that the law is ever going to change and for him to imply that it may at some point in time is incorrect.

THE COURT:  I will overrule that objection.

[Defense Counsel]:  May we have a running objection on that?

THE COURT:  You may.

[Defense Counsel]:  To sit here and make these jurors think that somehow something is going to change in what they are sentencing him to –

[Prosecutor]:  That's why I said unless, Judge, unless.  I am not saying it is going to happen.  I said unless.

[Defense Counsel]:  Well, this is making the matter worse, he is saying that maybe it will happen and everybody in this room has to work on the premise that nothing is ever going to change about what we are told them [sic] in voir dire and what the law says now.  So to imply that it is somehow, some way this is just a wink-and-a-nod process down here, is certainly improper.

THE COURT:  Overrule your objection, [Defense Counsel].

Q.  (By [Prosecutor])  That's the law right now, is that correct?

A.  That's correct.

[Defense Counsel]:  Once again, Your Honor, we would object to him going back to it by saying "That's the law right now," once again imply that somehow there is something in the works that will change what we all

know is for the going to [sic].

THE COURT:  Overruled.

Q.  (By [Prosecutor])  Parole serves many purposes; is that correct?

[Defense Counsel]:  We would object to talking about to parole [sic]  because it is not available in this case.

[Prosecutor]:  That's what I am getting to, Judge.

Q.  (By [Prosecutor])  What purpose does parole serve?

[Defense Counsel]:  Your Honor, once again we would object to this.  It is not a factor in a case that's life without parole.

THE COURT:  May I see the attorneys.

(Following proceedings had at Bench Conference.)

THE COURT:  I presume you are going to tie parole up?

[Prosecutor]: Parole is for good behavior and the defendant will not have access to that.  That's all I am going into it.

[Defense Counsel]:  That's not the only incentive for good behavior.

[Prosecutor]:  It is an accurate statement.

THE COURT:  I will overrule the objection.

(End of Bench Conference.)

THE COURT:  Overruled.

Q.  (By [Prosecutor])  The availability of parole for most of the general population inmates, that help to maintain order and security?

A.  Yes, sir, it gives an inmate a reason to behave.

Q. And a capital murder life without parole, obviously parole is unavailable, does he have that incentive?

A. That incentive is not there for him. I don't know what it would take, the incentive is not there.

With this, the prosecutor turned briefly to other matters and then passed Merrilott to the defense for cross-examination.

*Simmons* held that, consistent with the Due Process Clause of the Fourteenth Amendment, a state "may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole."[36] In the instant case, the jury was fully aware that, under current Texas law, the only alternative to the death penalty for a defendant convicted of capital murder is life without parole. Nevertheless, in an extrapolation of the due-process principle announced in *Simmons*, the appellant argues that the prosecutor's suggestion that the law might at some future point in time retroactively change with respect to parole eligibility for life-sentenced capital defendants deprived him of due process. We need not decide, however, whether *Simmons*'s due-process holding can or should be extended in this way because, in any event, the appellant's trial objection was insufficiently specific to alert the trial court that the purported impropriety of the prosecutor's suggestion that the Legislature could someday retroactively change the parole law for life-sentenced capital defendants was grounded in federal due process.

_____

[36] 512 U.S. at 171.

To preserve a complaint for appellate review, a party must first timely lodge his complaint in the trial court by way of a "request, objection, or motion that . . . stated *the grounds* for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific *grounds* were apparent from the context[.]"[37]  Here, when the prosecutor suggested that, if the appellant were sentenced to life, he would not be eligible for parole "[u]nless the laws change sometime in the future[,]" the appellant timely objected, but the immediately stated ground for his objection was simply that this suggestion was "improper."  He did not explain what he believed to be improper about the suggestion, and a precise basis for the purported impropriety would not have been readily apparent to the trial court from the context.  He next suggested that there was "no evidence" in the record "that the law is ever going to change" and that to imply that it would change "is incorrect."  If we construe this to constitute an objection that the prosecutor was arguing facts outside of the record,[38] then we observe that the appellant's *Simmons* due-process complaint on appeal fails to comport with the objection raised at trial.  And the appellant's further trial assertion that the prosecutor's suggestion is "incorrect" provides no clearer basis for the ruling he sought from the trial judge than did his

---

[37]

   TEX. R. APP. P. 33.1(a)(1)(A) (emphasis supplied).

[38]

   *See* George E. Dix & Robert O. Dawson, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 37.21 (2d ed. 2001), at 611 ("The most fundamental rule of closing argument is that counsel must confine their arguments to the evidence that was introduced during the trial and to reasonable deductions from that evidence.").

naked assertion that the suggestion was "improper." While it is abundantly clear from the context *what* the appellant was objecting to, the "grounds for the ruling" he sought are not.[39] "A trial objection must specify the legal theory later relied upon on appeal."[40] The appellant's initial objection here did not. It is true that the appellant persisted in his objection, but his later iteration that the prosecutor's suggestion was simply "improper" likewise failed to identify a legal basis for the ruling he sought. We hold that the appellant failed to preserve his presently asserted *Simmons*-derived complaint for appeal.

In addition, we hold that, any error that may have emanated from the prosecutor's suggestion with respect to parole eligibility, on the particular facts of this case, did not contribute to the jury's answer to the statutory special punishment issues and was therefore harmless beyond a reasonable doubt.[41] The prosecutor's suggestion was not part of any broader strategy (as was the case in *Simmons*) to persuade the jury that it should find that the appellant constitutes a continuing threat to society because the evidence shows he is

---

[39] TEX. R. APP. P. 33.1(a)(1)(A).

[40] George E. Dix & Robert O. Dawson, 43A TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 42.94 (2d ed. 2001), at 283.

[41] For purposes of this harm analysis, we will assume that the appellant did preserve his present *Simmons*-derived due-process complaint for appeal. We will also assume, without deciding, that the trial court erred to overrule the appellant's objection and that the objection preserved a constitutional error for appeal, invoking Rule 44.2(a) of the Rules of Appellate Procedure. *See* TEX. R. APP. P. 44.2(a) ("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the [reviewing court] must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.").

dangerous to the public at large and might someday, if not sentenced to death, be again released into that segment of society. Indeed, quite the opposite. As the balance of the testimony quoted above demonstrates, the suggestion occurred, more or less incidentally, in the context of a colloquy in which the prosecutor was attempting to show that the appellant would actually constitute a threat of violence even in the context of prison society.[42] The prosecutor did not repeat his suggestion at any later point in the punishment proceedings. He never argued or intimated during his punishment summations that the jury should answer the first special issue affirmatively in order to protect itself by assuring that the appellant will never pose a future danger to the general public. In other words, the prosecutor did not broach the possibility that the parole law would change as part of any concerted scheme to convince the jury to impose the death penalty as an act of societal self-preservation, and the jurors were unlikely, on the record before us, to have construed it in that way. We are confident that the prosecutor's suggestion did not contribute to the jury's affirmative answer to the future-dangerousness special issue. We therefore hold that any error in failing to sustain the appellant's objection was harmless beyond a reasonable doubt. The appellant's fifth point of error is overruled.

---

[42]

And indeed, in this context, what the prosecutor was really emphasizing was the appellant's parole *in*eligibility, in an attempt to persuade the jury that, in the absence of the "incentive" of parole to regulate his behavior, the appellant would be more likely to commit acts of violence in the penitentiary.

## Constitutionality of Article 37.071

The appellant maintains in his eighth point of error that Article 37.071, Section 2(f)(4)'s definition of mitigating evidence is unconstitutionally narrow insofar as it fails to accommodate jury consideration of any mitigating evidence that does not directly reduce a capital defendant's moral blameworthiness. We have repeatedly reject this claim,[43] and do so again today. The appellant's eighth point of error is overruled.

As a corollary to his eighth point of error, the appellant argues in his ninth point of error that the trial court erred in refusing to submit a jury instruction that he requested at the close of the punishment phase that would have expressly informed the jury that its consideration of mitigating evidence was not limited to that evidence which directly reduces his "moral blameworthiness";[44] they could also, according to this proposed instruction, "consider any other evidence that would justify a sentence of life without parole." The trial court's refusal to submit this requested instruction, the appellant contends, caused him "*some harm*" under *Almanza v. State*.[45] He argues that, because his requested instruction was not an *incorrect* instruction in contemplation of our case law, it was therefore "law of the case"

---

[43] *Lucero v. State*, 246 S.W.3d 86, 96 & n.11 (Tex. Crim. App. 2008).

[44] TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4).

[45] 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on State's motion for reh'g).

for purposes of Article 36.14 of the Code of Criminal Procedure.[46] We recently rejected an almost identical claim in *Coble v. State*,[47] in which we observed that the statutory definition of mitigating evidence contains no "nexus" requirement, and that prior case law has

> never suggested that a jury can, should, or must be instructed not to consider any nexus between the crime and the mitigating evidence. Such an instruction would be necessary only if the jury would be reasonably likely to infer a nexus requirement from the statutory words. That is not the case.[48]

That the appellant's proposed jury instruction was not incorrect does not mean that the trial court was necessarily obliged to submit it under Article 36.14 if the court's charge was otherwise adequate to instruct the jury on "the law applicable to the case." Having rejected a substantially similar argument in *Coble*, we reject the appellant's argument today. His ninth point of error is overruled.

In his point of error number ten, the appellant challenges the constitutionality of that aspect of Article 37.071 which requires at least ten negative votes before the jury is authorized to return a negative verdict on any of the special punishment issues.[49] We have

---

[46]

*See* TEX CODE CRIM. PROC. art. 36.14 ("in each felony case . . . the judge shall, before the argument begins, deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case[.]").

[47]

___ S.W.3d ___ (Tex. Crim. App., No. AP-76,019, 2010 WL 3984713, delivered October 13, 2010) (slip op. at *23).

[48]

*Id*.

[49]

TEX. CODE CRIM. PROC. art. 37.071, §§ 2(d) & (f)(2).

rejected this challenge to the so-called "10-12 rule" on many prior occasions,[50] and we reject it today as well. We overrule the appellant's tenth point of error.

In his eleventh point of error, the appellant complains that the future-dangerousness special issue is unconstitutional because it fails to define "probability," "criminal acts of violence," and "continuing threat to society."[51] We have previously rejected this claim,[52] and do so again in the instant case. We overrule the appellant's eleventh point of error.

In his twelfth and thirteenth points of error, the appellant invokes *Ring v. Arizona*[53] and *Apprendi v. New Jersey*[54] to argue that the mitigation special issue is unconstitutional to the extent that it fails to place the burden of proof upon the State, and to a level of confidence beyond a reasonable doubt, to demonstrate an absence of mitigating circumstances sufficient to justify imposition of a life sentence.[55] We have consistently declined so to hold,[56] and we

---

[50]
*Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005).

[51]
*See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1) ("On conclusion of the presentation of the [punishment phase] evidence, the court shall submit the following issues to the jury: . . . whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]").

[52]
*Coble v. State*, *supra* (slip op. at *24 & n.150).

[53]
536 U.S. 584 (2002).

[54]
530 U.S. 466 (2000).

[55]
*See* TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1) ("The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b), it shall answer the following issue: . . . Whether, taking into consideration all of the evidence, including the

likewise reject the appellant's argument today. The appellant's twelfth and thirteenth points of error are overruled.

Finally, in his fourteenth point of error, the appellant contends that Article 37.071 violates the Texas constitution because it simultaneously restricts and allows open-ended jury discretion in imposing the death penalty, relying on Justice Blackmun's dissenting opinion in *Callins v. Collins*.[57] Having previously rejected this claim,[58] we likewise reject it now. The appellant's fourteenth point of error is overruled.

## CONCLUSION

The judgment of the trial court is affirmed.

DELIVERED:        March 2, 2011
DO NOT PUBLISH

---

circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment without parole rather than a death sentence be imposed.").

[56]

*Segundo v. State*, 270 S.W.3d 79, 102 (Tex. Crim. App. 2008).

[57]

510 U.S. 1141 (1994) (Blackmun, J., dissenting).

[58]

*See, e.g.*, *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004) (rejecting identical claim under both federal and state constitutions).